# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1517

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Armando Grimaldo, | * |
| | * |
| Defendant - Appellant. | * |


|  |  |
|---|---|
| _____ | Appeals from the United States District Court for the Southern District of Iowa. |
| No. 99-2177 | |
| _____ | |

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Julio Escobedo-Romero, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted:  November 15, 1999

Filed:  June 2, 2000

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Armando Grimaldo and Julio Escobedo-Romero appeal their convictions for conduct related to a drug distribution conspiracy headed by Jose Grimaldo-Zamorron, Grimaldo's brother. Grimaldo was convicted of conspiracy to distribute methamphetamine and two counts of distribution of methamphetamine and sentenced to 120 months in prison. Escobedo-Romero was convicted of conspiracy to distribute methamphetamine and possession of cocaine with intent to distribute and sentenced to 70 months in prison. Escobedo-Romero argues that there was insufficient evidence to convict him on both counts. Both he and Grimaldo argue that there was no probable cause to search Grimaldo's apartment. They also contend that the district court[1] erred in admitting certain evidence and in its findings of drug quantity attributable to them. Finally, Escobedo-Romero and Grimaldo argue that in light of the Supreme Court's decision in United States v. Jones, 526 U.S. 227 (1999), they were deprived of due process because drug quantity was not charged in the indictment, submitted to the jury, and found beyond a reasonable doubt. We affirm.

## I.

In March 1998, a confidential informant met with Grimaldo-Zamorron and his girlfriend, Dina Rivas, in apartment 714 at the Tallcorn Towers in Marshalltown, Iowa to arrange a methamphetamine purchase. Pursuant to the arrangement, Jon Neuschwanger, an undercover agent who was a member of the Mid-Iowa Drug Task

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

Force, purchased a quarter pound of amphetamine[2] from Rivas in a car next to the Tallcorn. Rivas regularly assisted Grimaldo-Zamorron in his illegal activities by delivering methamphetamine and setting up deals. She and Grimaldo-Zamorron lived with Escobedo-Romero in apartment 714 during the month of March, and Grimaldo-Zamorron stored methamphetamine there and sold it from the apartment. Grimaldo was out of the country at the time.

In June 1998, Segar Brown was arrested for possession of methamphetamine. Following his arrest, he agreed to cooperate in the investigation of Grimaldo-Zamorron's drug activities. Rivas and Grimaldo-Zamorron had moved into the Flamingo Motel, and Grimaldo had returned from Mexico and was staying with Escobedo-Romero in apartment 714 at the Tallcorn. On June 8, Brown went to the Flamingo and paid Grimaldo-Zamorron $300 for a previous purchase. Later that day, after finding no one at the Tallcorn, Brown returned to the Flamingo and Grimaldo-Zamorron told him to "go back to the Tallcorn and talk to Julio and Armando." Brown then acquired a half-ounce of methamphetamine from Grimaldo in apartment 714. Escobedo-Romero was present during the transaction.

Three days later, Brown went back to apartment 714, paid $400 to Grimaldo-Zamorron for the half-ounce, and asked for another ounce. Grimaldo and Escobedo-Romero were present. The next day, June 12, Brown and Darius Carr were sent to apartment 714 to get the ounce of methamphetamine.[3] According to Brown, no one was there; Carr testified that Grimaldo was present. They then went to the Flamingo, where Grimaldo-Zamorron wrote a note in Spanish and told them to give it to

---

[2]Rivas alleged that the substance was methamphetamine, but laboratory tests showed that it was amphetamine.

[3]Carr, whose father was a member of the Mid-Iowa Drug Task Force, agreed to help the task force by going with Brown to pick up the methamphetamine.

-3-

Grimaldo. They returned to the Tallcorn, gave the note to Grimaldo, and received an ounce of methamphetamine.

On June 15, Brown and Neuschwanger negotiated with Grimaldo-Zamorron outside a restaurant for the purchase of a quarter-pound of methamphetamine. Grimaldo-Zamorron went to the Tallcorn, then to the Flamingo. Brown and Neuschwanger met him at the Flamingo and obtained the quarter-pound, giving Grimaldo-Zamorron a partial payment of $900. Two days later, Neuschwanger paid Grimaldo-Zamorron the $2100 that was still owed, and Grimaldo-Zamorron gave him an additional two ounces. On June 19, when Neuschwanger went to the Flamingo to pay for the two ounces, Grimaldo-Zamorron accepted the payment and fronted him a half-pound of methamphetamine.

The investigation culminated on June 25. Neuschwanger met Grimaldo-Zamorron at the Flamingo. They agreed that Neuschwanger could return in an hour to pick up a pound of methamphetamine. Both men left the hotel, and Grimaldo-Zamorron went to the Tallcorn. After Neuschwanger and Grimaldo-Zamorron returned separately to the Flamingo, Neuschwanger rode in Grimaldo-Zamorron's car to the Tallcorn. While Neuschwanger waited in the car, Grimaldo-Zamorron went in and came out with a package in the front of his pants. Grimaldo-Zamorron gave the package, which contained a pound of methamphetamine, to Neuschwanger in the parking lot at the Tallcorn. Neuschwanger suggested they drive to a cemetery so that he could count the money he was to pay Grimaldo-Zamorron. When they arrived at the cemetery, Neuschwanger signaled other officers to arrest Grimaldo-Zamorron.

The task force obtained search warrants for the room at the Flamingo and for apartment 714 at the Tallcorn. The search revealed no controlled substances at the Flamingo. At the Tallcorn, Escobedo-Romero was found in apartment 714 along with Barb Thompson and her daughter. The officers found 86.5 grams of cocaine in a jacket in the closet and $564 in cash. The owner and manager of the Tallcorn informed an

agent that she had seen Grimaldo-Zamorron going into apartment 728 earlier that day. The agent checked the registration and found that apartment 728 was rented to Grimaldo. The police then obtained an additional warrant to search Grimaldo's apartment, where they found him along with 52.2 grams of methamphetamine, 25.2 grams of cocaine, and $1190 in cash.

Grimaldo and Escobedo-Romero were tried together. The jury acquitted them of the June 8 sale, but convicted both for conspiracy to distribute methamphetamine. Grimaldo was also convicted of two counts of distribution of methamphetamine, one on June 12 and one on June 25. Escobedo-Romero was acquitted of the June 12 sale, but convicted of possession of cocaine with intent to distribute.[4] The district court found that the conspiracy was responsible for sixty pounds of methamphetamine. It attributed three pounds of that to Grimaldo and sentenced him to the mandatory minimum of 120 months. The court attributed two pounds of the methamphetamine and the cocaine found in the jacket to Escobedo-Romero and sentenced him to seventy months. Grimaldo and Escobedo-Romero appeal.

## II.

Perhaps the most important legal issue raised in this appeal is whether the Supreme Court's decision in Jones v. United States, 526 U.S. 227 (1999), has wrought a change in the law that requires drug quantities to be charged in the indictment and proven to a jury beyond a reasonable doubt in order to pass muster under the Constitution. The defendants did not raise this argument below because the Jones case had not been decided. We therefore review for plain error. See Johnson v. United

---

[4]The judgment in Escobedo-Romero's case erroneously lists this offense as "Distribution of Cocaine." Both the indictment and the verdict correctly refer to possession of cocaine with intent to distribute. Either crime is prohibited by the same statutory provision, 21 U.S.C. § 841(a)(1).

States, 520 U.S. 461, 466 (1997). Plain error requires (1) error (2) that is plain and (3) that affects substantial rights. See id. at 467. If these three criteria are met, a reviewing court must determine whether the error affected the fairness, integrity, or public reputation of the judicial proceedings. See id.

## A.

Grimaldo and Escobedo-Romero argue that, in light of Jones, the district court erred by determining drug quantity as a sentencing factor. In Johnson, the Court reiterated that new rules for the conduct of criminal prosecutions apply retroactively to all cases pending on direct review.[5] See id. We look first, therefore, at whether the intervening Jones decision established a new rule for the conduct of criminal prosecutions. The Jones Court interpreted the federal carjacking statute, which then read:

> Whoever, possessing a firearm . . . , takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall–
>      (1) be fined under this title or imprisoned not more than 15 years, or both,
>      (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>      (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

_____

[5]After Johnson was convicted of perjury under 18 U.S.C. § 1623 and before her appeal, United States v. Gaudin, 515 U.S. 506 (1995), held that the materiality of a false statement in an 18 U.S.C. § 1001 case must be submitted to the jury. See Johnson, 520 U.S. at 464-65. Since "the failure to submit materiality to the jury would be error under Gaudin," the Court found error because the district court decided the issue of materiality in Johnson's case. Id. at 467.

18 U.S.C. § 2119 (Supp. V 1993). The district court found by a preponderance of the evidence that one of the victims of the carjacking in which Jones was involved suffered serious bodily injury and sentenced Jones to twenty-five years in prison. See Jones, 526 U.S. at 231. The indictment had not charged serious bodily injury and the jury instructions that listed the elements of the offense omitted any reference to serious bodily injury. See id. On appeal, the defendant argued that serious bodily injury was an element of the offense that should have been charged in the indictment and proven to the jury beyond a reasonable doubt. The Supreme Court agreed.

The Court determined that the statute was unclear and construed it to contain three separate offenses rather than one offense with three sentencing options. See id. at 234, 251-52. Serious bodily injury was thus held to be an element of the offense, rather than a mere sentencing enhancement. This interpretation was made "in light of the rule that any interpretive uncertainty should be resolved to avoid serious questions about the statute's constitutionality." Id. at 229.

Any argument that Jones requires us to interpret drug quantity as an element of a 21 U.S.C. § 841 offense is foreclosed by the language of the statute and by circuit precedent. The structure and plain language of the statute leave no doubt that drug quantity is a sentencing factor. Section 841(a), titled "Unlawful acts," states

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally–
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
> (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

21 U.S.C. § 841(a) (1994). Section 841(b), titled "Penalties," provides that a person who violates subsection (a) "shall be sentenced as follows" and contains a variety of sentencing ranges that are based in large part on drug quantity findings. 21 U.S.C. §

841(b) (1994 & Supp. IV 1998). Also, on several occasions, we have held that drug quantity is a sentencing factor rather than an element of the crime defined in section 841(a). See, e.g., United States v. Holt, 149 F.3d 760, 762 (8th Cir. 1998); United States v. Abanatha, 999 F.2d 1246, 1251 (8th Cir. 1993); United States v. Wood, 834 F.2d 1382, 1388-90 (8th Cir. 1987). Because drug quantity has been determined to be a sentencing factor, the district court correctly applied the law. This does not, however, foreclose the argument that treating drug quantity as a sentencing factor violates the Constitution in light of Jones.

**B.**

In Jones, the Court explained the principle underlying its position that if the carjacking statute were construed to contain sentencing enhancements it might be unconstitutional: "[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. at 243 n.6. The Court went on to say, however, that its "prior cases suggest rather than establish this principle." Id. In addition, the Court expressly stated that it was announcing no new principle of constitutional law. See id. at 252 n.11.

Section 841(b) contains a variety of sentencing ranges that depend on the type and quantity of drug involved in the offense as well as on other factors, including prior convictions. Most importantly for our purposes, however, the maximum sentences increase dramatically as the quantity increases. For example, the maximum sentence for a crime involving methamphetamine can be twenty years, forty years, or life, depending solely on the quantity involved in the offense. Thus, if any fact other than recidivism that increases the maximum sentence for a crime must be charged in the indictment and proven to a jury beyond a reasonable doubt, treating drug quantity as a sentencing factor with none of these procedural protections would violate this rule.

To determine whether treating drug quantity as a sentencing factor is constitutional error in light of Jones, we briefly review earlier Supreme Court decisions that deal with the due process requirements for conviction and sentencing. In Specht v. Patterson, 386 U.S. 605 (1967), the Court held that due process was not satisfied where the petitioner was convicted under a state statute that carried a maximum sentence of 10 years but sentenced under another statute (the Sex Offenders Act) that allowed the trial court to sentence a convicted defendant to an indefinite term of one year to life if the court found that the person constituted a threat of bodily harm to the public or was a habitual offender and mentally ill. See 386 U.S. at 607, 611.

Soon after, the Court made clear that due process requires that "every fact necessary to constitute the crime" charged be proven beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). This high standard was necessary, the Court asserted, because of the immensely important interests of the accused: loss of liberty and stigmatization. See id. at 363.

The Court then struck down a state law that required a defendant charged with murder (punishable by life in prison) to prove that he acted in the heat of passion on sudden provocation in order to reduce his crime to manslaughter (punishable by a maximum of twenty years in prison). See Mullaney v. Wilbur, 421 U.S. 684 (1975). Because malice aforethought was an essential element of murder, the fact that the law conclusively implied it when the homicide was intentional and unlawful violated Winship. See id. at 686, 703-04. "The safeguards of due process are not rendered unavailing simply because a determination may already have been reached that would stigmatize the defendant and that might lead to a significant impairment of personal liberty." Id. at 698. The Court pointed out that Winship was concerned with substance rather than form, and implied that a state could not redefine elements of crimes and characterize them as factors that bear only on punishment. See id. at 698-99.

-9-

In McMillan v. Pennsylvania, 477 U.S. 79 (1986), the Court upheld a state statute that required a mandatory five-year minimum sentence for certain felonies if the sentencing judge found by a preponderance of the evidence that the individual visibly possessed a firearm during commission of the felony. The Court pointed out that the statute merely limited the sentencing court's discretion in selecting a punishment within the range that was already available to it, and that it neither altered the maximum punishment for the crime nor created a separate offense with a separate penalty. See id. at 87-88. There was no indication that the statute had been designed "to permit the visible possession finding to be a tail which wags the dog of the substantive offense." Id. at 88.

Finally, the Court interpreted 8 U.S.C. § 1326 to define one crime: a deported alien returning to the United States without special permission. See Almendarez-Torres v. United States, 523 U.S. 224, 226 (1998). If convicted, the alien could be sentenced to a maximum of 2 years; his sentence, however, could be enhanced to as much as 20 years if he had been deported after a conviction for an aggravated felony. The Court held that the enhancement was not a separate crime, but merely a penalty provision. See id. According to the Court, recidivism has typically been considered a sentencing factor. See id. at 230. The Court specifically rejected the argument that the Constitution requires that any factor that significantly increases the maximum sentence must be considered an element of the crime. See id. at 247.

Exactly one year after Almendarez-Torres was decided, the Supreme Court decided Jones, in which it held that factors that increase the maximum sentence for the crime of carjacking are elements of the offense. These cases illustrate that the Court has long been grappling with the due process requirements for conviction and sentencing. The Supreme Court's failure to conclusively resolve the constitutional issues raised by these cases and discussed in Jones leads us to doubt that the Court announced a new rule for criminal prosecutions that must be applied retroactively.

Even if the Court later embraces the principle it announced in footnote 6 of <u>Jones</u> as established law, any error made by the district court must be plain at the time of appellate consideration. <u>See</u> <u>Johnson</u>, 520 U.S. at 468. For an error to be plain, it must be obvious. <u>See</u> <u>United States v. Tulk</u>, 171 F.3d 596, 599 (8th Cir. 1999). If the trial occurred today, it is not obvious that treating drug quantity as a sentencing factor would be unconstitutional. To date, eight circuit courts of appeals have addressed the treatment of 841(b) drug quantities in light of <u>Jones</u>. All uphold the pre-<u>Jones</u> rule that drug quantity is a sentencing factor, not an element of the 841(a) offense. <u>See</u>, <u>e.g.</u>, <u>United States v. Jackson</u>, 207 F.3d 910 (7th Cir. 2000); <u>United States v. Thomas</u>, 204 F.3d 381 (2d Cir. 2000), <u>petition for cert. filed</u> (Mar. 24, 2000) (No. 99-8779); <u>United States v. Rios-Quintero</u>, 204 F.3d 214 (5th Cir. 2000); <u>United States v. Swiney</u>, 203 F.3d 397 (6th Cir. 2000); <u>United States v. Smith</u>, No. 99-4454, 2000 WL 139250 (4th Cir. Feb. 8, 2000) (unpublished); <u>United States v. Hester</u>, 199 F.3d 1287 (11th Cir. 2000); <u>United States v. Jones</u>, 194 F.3d 1178 (10th Cir. 1999), <u>petition for cert. filed</u> (Feb. 10, 2000) (No. 99-8176); <u>United States v. Williams</u>, 194 F.3d 100, 107 (D.C. Cir. 1999) (posing the unanswered question, "Do section 841's penalty provisions, which extend for pages, cover topics ranging from death and serious bodily injury to water pollution on federal lands to date rape, and significantly affect sentence severity, suggest that the sentencing tail may be wagging the section 841 dog?"). Only the Seventh and Tenth Circuits have addressed the constitutionality of classifying drug quantity as a sentencing factor post-<u>Jones</u>, and both adhered to their prior cases that held the penalty provisions of section 841(b) constitutional. <u>See</u> <u>Jackson</u>, 207 F.3d at 920-21; <u>Jones</u>, 194 F.3d at 1186.

We are not certain that the Constitution requires that any fact, other than prior conviction, that increases the maximum penalty for a crime must be charged in the indictment and proven to a jury beyond a reasonable doubt. Until this constitutional principle is established, rather than suggested, we decline to find plain error under these circumstances.

## III.

Escobedo-Romero challenges his convictions for possession of cocaine with intent to distribute and conspiracy to distribute methamphetamine, arguing that there was insufficient evidence to convict him. We review the sufficiency of the evidence to sustain a conviction de novo. See United States v. Brooks, 174 F.3d 950, 954 (8th Cir. 1999). We must view the evidence in the light most favorable to the government, resolve conflicts in the government's favor, and accept all reasonable inferences that support the verdict. See United States v. Surratt, 172 F.3d 559, 563 (8th Cir.), cert. denied, 120 S. Ct. 257 (1999). We uphold a conviction if substantial evidence supports it. See United States v. Maggard, 156 F.3d 843, 846 (8th Cir. 1998), cert. denied, 525 U.S. 1170 (1999), and cert. denied, 119 S. Ct. 1372 (1999). Substantial evidence is that which suffices to convince a reasonable jury of a defendant's guilt beyond a reasonable doubt, not that which rules out all reasonable hypotheses of innocence. See id.

The elements of the crime of possession of cocaine with intent to distribute are knowing possession of cocaine and the intent to distribute it. See United States v Rodgers, 18 F.3d 1425, 1429 (8th Cir. 1994). The police found the jacket that contained 86.5 grams of cocaine in Escobedo-Romero's closet, and there was no evidence that the jacket or the drugs belonged to anyone else. Because there was no evidence that anyone other than Escobedo-Romero resided in apartment 714 at the time of the search, he had constructive possession of the cocaine. See United States v. McCracken, 110 F.3d 535, 541 (8th Cir. 1997) (if person has dominion over premises where contraband is concealed, constructive possession established). Constructive possession satisfies the knowing possession element. See id. Rogelio Rosales testified that he had purchased three small quantities of cocaine (1 gram, 1/8 gram, and 1/16 gram) from Escobedo-Romero prior to December 1997. (Tr. I at 156, 160-161) The jury could infer two things from this testimony: first, that Escobedo-Romero had the requisite intent to distribute, and second, that 86.5 grams of cocaine was an amount for

-12-

distribution rather than for personal consumption. Substantial evidence supports Escobedo-Romero's conviction for possession of cocaine with intent to distribute.

To prove Escobedo-Romero guilty of conspiracy to distribute methamphetamine, the government must have shown that a conspiracy existed, that Escobedo-Romero knew of the conspiracy, and that he knowingly became a part of the conspiracy. See United States v. Rork, 981 F.2d 314, 316 (8th Cir. 1992). A conspiracy may be inferred from circumstantial evidence. See United States v. Garrison, 168 F.3d 1089, 1095 (8th Cir. 1999). The only element at issue is whether Escobedo-Romero knowingly participated in the conspiracy.

The government argues that four pieces of evidence support Escobedo-Romero's conviction for conspiracy: (1) Brown testified that Grimaldo-Zamorron told him to go to the Tallcorn and talk to Julio and Armando on June 8, (2) Escobedo-Romero was present when Brown purchased methamphetamine from Grimaldo-Zamorron on more than one occasion and when he paid $400 to Grimaldo-Zamorron on June 11, (3) Brown said he bought drugs from members of the conspiracy, including Escobedo-Romero, and (4) Thompson testified that she purchased cocaine and methamphetamine from Escobedo-Romero. The record does not support points (3) and (4). Neither Brown nor Thompson testified that they made purchases from Escobedo-Romero. Thompson did testify that he gave her drugs, but that she never paid for them.

If the government's case must rest on points (1) and (2), it is indeed weak. Brown's testimony regarding the June 8 transaction shows that Escobedo-Romero probably answered the door when Brown arrived at apartment 714 and that he spoke to Brown. Brown testified that their conversation was social and had nothing to do with drugs. Grimaldo was the one who gave Brown the methamphetamine. The fact that Escobedo-Romero was present when Brown engaged in drug transactions with others does not prove his guilt. "Mere presence at the location of the crime alone, even

when coupled with knowledge of that crime, is not sufficient to establish guilt on a conspiracy charge." United States v. Hernandez, 986 F.2d 234, 236 (8th Cir. 1993).

Other evidence, not pointed to by the government, supports Escobedo-Romero's conviction for conspiracy. Rivas testified that Grimaldo-Zamorron stored as much as two pounds of methamphetamine at Escobedo-Romero's apartment when they lived with him in March. The drugs were stored in the living room closet where Grimaldo-Zamorron kept his things and wrapped so that they were not readily identifiable. Rivas stated, however, that Grimaldo-Zamorron sold methamphetamine from the apartment while they lived there and that Escobedo-Romero was present during some of these transactions. After Grimaldo-Zamorron and Rivas moved out of the Tallcorn and after Grimaldo returned from Mexico in May, Grimaldo-Zamorron told Rivas that he was storing methamphetamine at his brother's place at the Tallcorn. Grimaldo lived with Escobedo-Romero until June 18. In addition, Grimaldo-Zamorron told Brown to go see Escobedo-Romero and Grimaldo on June 8. Escobedo-Romero was present when Grimaldo gave Brown methamphetamine that day, and Brown testified that Grimaldo got it out of the living room closet in apartment 714.

A jury could reasonably infer that Escobedo-Romero knowingly allowed Grimaldo-Zamorron to store methamphetamine in the closet of apartment 714, particularly because he was aware that both Grimaldo-Zamorron and Grimaldo distributed methamphetamine from the apartment. Because the evidence sustains the conclusion that Escobedo-Romero knowingly allowed his apartment to be used for the storage and distribution of methamphetamine, substantial evidence supports his conviction for conspiracy. See Salinas v. United States, 522 U.S. 52, 65 (1997) (a defendant need only "adopt the goal of furthering or facilitating the criminal endeavor" to be a conspirator).

Both Grimaldo and Escobedo-Romero argue that the district court erred by failing to suppress the evidence found in Grimaldo's apartment. Escobedo-Romero lacks standing to challenge the search because he could have had no reasonable expectation of privacy in Grimaldo's apartment. See United States v. Washington, 197 F.3d 1214, 1216 (8th Cir. 1999). Grimaldo has standing, however, so we review the district court's factual findings underlying its ruling on the motion to suppress for clear error and review de novo its conclusions of law. See United States v. Schmitz, 181 F.3d 981, 985 (8th Cir. 1999). We must "ensure that the evidence as a whole provides a substantial basis for finding probable cause for the issuance of the warrant." Id. Probable cause exists when the affidavit sets forth facts sufficient to create a "fair probability" that evidence of a crime will be found in the place to be searched. United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999), cert. denied, 120 S. Ct. 1442 (2000). A prima facie showing of criminal activity is not required to support probable cause. See id. at 787.

Only after the officers completed the search of apartment 714 did they discover that Grimaldo had a separate apartment in the Tallcorn Towers. The owner of the building informed one of the agents that she saw Grimaldo-Zamorron entering apartment 728 that morning. The agent checked the registration and found that Grimaldo rented 728. Grimaldo's lease began on June 18, only one week before the bust and the subsequent searches.

The affidavit supporting the search warrant spelled out in some detail the particulars of the methamphetamine conspiracy. It included the fact that a confidential informant had previously acquired methamphetamine from Grimaldo in apartment 714 at Grimaldo-Zamorron's direction on two occasions. The affidavit also stated that Grimaldo-Zamorron made two trips to the Tallcorn on June 25, and that the police became aware that Grimaldo was renting apartment 728 that same day. Looking at the

evidence as a whole, we hold that there was probable cause to issue a search warrant for Grimaldo's apartment at the Tallcorn.

## V.

Grimaldo and Escobedo-Romero argue that the district court erred by admitting certain evidence, including documents, hearsay statements, audiotapes, and Rosales's testimony. "We will not reverse a district court's evidentiary rulings unless they constitute a clear and prejudicial abuse of discretion." United States v. Withorn, 204 F.3d 790, 794 (8th Cir. 2000).

We have considered the list of alleged evidentiary errors and reviewed the transcript for each. The district court admitted Rosales's testimony, which related to matters entirely outside the time frame of the charged conspiracy, under Fed. R. Evid. 404(b). The court instructed the jury that the testimony could only be used to determine whether the defendants had the knowledge and intent necessary with respect to the crimes for which they were on trial. The court emphasized that any past similar acts were not evidence that either Grimaldo or Escobedo-Romero committed such an act in this case. Rosales did make some hearsay statements, but the court instructed the jury to consider only what he actually observed, not what he heard from other people. After reviewing Rosales's testimony along with the court's instructions, we find no abuse of discretion.

The district court did improperly admit hearsay testimony from a member of the task force because it believed that he was testifying about what he heard on a surveillance tape of the June 12 transaction. Once the court became aware that the officer was relying on the statements of Brown and Carr, rather than on the audiotape, it reversed its ruling and told the jury not to consider the testimony regarding the transaction as proof of the transaction. Later testimony from Brown and Carr regarding

the same transaction was substantially similar to the officer's testimony.  We conclude that even if there was error, it was harmless beyond a reasonable doubt.

The defendants' remaining evidentiary challenges[6] are similarly without merit and require no further discussion.  The district court did not abuse its discretion.

## VI.

Finally, Escobedo-Romero and Grimaldo argue that the district court erred in its calculation of drug quantities attributable to them.  We review determinations of drug quantity attributable to a defendant for clear error.  See United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994).  The district court found that sixty pounds of methamphetamine could be attributed to the entire conspiracy, but took into consideration the fact that Grimaldo was out of the country for a large part of the conspiracy.  The court also considered Rivas's testimony about the quantity of methamphetamine stored at Escobedo-Romero's apartment.  We hold that the district court did not clearly err by attributing three pounds of methamphetamine to Grimaldo and two pounds of methamphetamine, plus 86.5 grams of cocaine, to Escobedo-Romero.

For the foregoing reasons, we affirm the judgment of the district court.

---

[6]The defendants argue that it was error to admit the audiotapes designated as Exhibits 1A, 2A, 3A, 4A, 5A, 8B, and 10B.  They also argue that it was error to admit the documents designated as Exhibits 11J, 11T, 11U, 11Q, and 11S.  Finally, they argue that it was error to admit Rivas's testimony regarding statements made to her by Grimaldo-Zamorron and an officer's testimony regarding a June 15 conversation between Brown and Grimaldo-Zamorron.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.