# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 00-3037

_____

United States of America,                *
                                         *

     Plaintiff - Appellee,         *

                                           *

     v.                              *

                                           *

Jose Alberto Mora-Higuera, also known *
as Mario Ruiz-Armenta,         *

                                           *

     Defendant - Appellant.      *

_____

No. 00-3254

_____

Appeals from the United States
District Court for the
District of Minnesota.

United States of America,                *

                                           *

     Plaintiff - Appellee,         *

                                           *

     v.                              *

                                           *

Antonio Botello, also known as     *
Antonio Benitez Botello,        *

                                           *

     Defendant - Appellant.      *

_____

Submitted: May 14, 2001

Filed: October 11, 2001

_____

Before LOKEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Antonio Botello and Jose Mora-Higuera were indicted on multiple counts, including conspiracy to distribute methamphetamine. 21 U.S.C. §§ 841(a)(1), 846 (1994). Botello went to trial and was convicted on the conspiracy charge. He now appeals his conviction, arguing that he was the subject of an illegal vehicle stop, that there was insufficient evidence to convict him, that the issue of drug quantity should have been submitted to the jury, and that the district court[1] erred when it allowed the government to comment on his ability to speak English and use leading questions in examining its own witness. Mora-Higuera pled guilty and now appeals his sentence, arguing that the district court erred in counting his involvement in the distribution of twenty pounds of methamphetamine and cocaine as relevant conduct in determining his sentence. See U.S. Sentencing Guidelines Manual § 1B1.3. We affirm in both cases.

On December 20, 1999, law enforcement officers arranged for an informant to purchase one pound of methamphetamine from Robert Alicea. The transaction was to take place at the Oasis Market in Inver Grove Heights, Minnesota, where Alicea worked. The informant was en route to the Inver Grove Heights location,

_____

[1] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, presided over the trial of Botello and the sentencing of Botello and Mora-Higuera. The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, ruled on Botello's pretrial motions.

accompanied by Special Agent Billings, when he received a phone call from Mora-Higuera, a known associate of Alicea. Mora-Higuera advised the informant to go to the Oasis Market in South St. Paul instead. Before arriving at the South St. Paul Oasis Market the informant received another call from Mora-Higuera, telling the informant to hurry because Mora-Higuera had to leave.

A police surveillance team at the South St. Paul Oasis Market observed Mora-Higuera and Botello drive up to the store, enter it, and leave a few minutes later, all before the informant and Billings arrived at the scene. The informant then arrived, went inside, and gave the store manager, Jamie Joseph (who also happened to be Mora-Higuera's girlfriend), $4,000 in police drug buy money in exchange for one pound of methamphetamine. Shortly after the informant left the area, Mora-Higuera and Botello returned in the same vehicle in which they had earlier departed. They went inside, were joined by a third individual, and drove away. Their car was stopped shortly thereafter by officers from the South St. Paul Police Department. As a result of the stop the police identified the driver as Botello, and one of the passengers as Mora-Higuera. All three of the car's occupants provided the same residence address, 372 Lawson, St. Paul, Minnesota. The police then followed the car to the residence, where all three men went inside. The residence ultimately turned out to be owned by Botello.

On December 28, 1999, a second controlled buy was attempted. The informant met Alicea at the Oasis Market in Inver Grove. Botello and Mora-Higuera then arrived in Botello's car. Alicea got in the car with them and told the informant to follow. Less than a mile from the store, Alicea got out of the car and collected $2,000 in buy money from the informant. The informant drove off and Alicea, Botello, and Mora-Higuera were arrested. A search of the car and passengers produced $5,000 cash: $3,000 in the glove compartment and $2,000 on Mora-Higuera. A search of Botello's residence produced $14,150 in cash, $2,450 of which was police buy money. The money was found in various places throughout Botello's residence:

$2,000 in a check box, $1,100 in a coat, $10,900 in a pair of his shoes ($2,300 of which was buy money), and $150 in a child's shirt (also buy money).

Botello's motion to suppress evidence obtained as a result of the vehicle stop was denied, and a jury found him guilty of conspiracy to distribute methamphetamine. Mora-Higuera pled guilty to multiple counts. The district court denied his request for a downward departure, and sentenced him to 292 months in prison.

I.

Botello appeals the district court's denial of his motion to suppress the evidence obtained from the vehicle stop of December 20th. In particular he argues that the stop violated the Fourth Amendment and that the subsequent use of his name and address, obtained as a result of the stop, in obtaining a warrant to search his residence was improper. We will disturb the district court's findings of fact only if we find them to be clearly erroneous. United States v. McMurray, 34 F.3d 1405, 1409 (8th Cir. 1994). We review its legal conclusions de novo. Id.

Under Terry v. Ohio, 392 U.S. 1 (1968), an investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). There is no requirement that there be a traffic violation. See Alabama v. White, 496 U.S. 325 (1990) (upholding stop of vehicle in absence of traffic violation). "In deciding whether to conduct a Terry stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." United States v. Thomas, 249 F.3d 725, 728 (8th Cir. 2001).

"In evaluating the validity of a stop . . . we must consider 'the totality of circumstances--the whole picture.'" United States v. Sokolow, 490 U.S. 1, 8 (1989)

-4-

(quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Here, the officers knew that Mora-Higuera was associated with Alicea, had called the informant regarding the change in location of the drug deal, and was present at the new site immediately before and after the buy took place. It was therefore reasonable for them to suspect Mora-Higuera of criminal activity and thus legal for them to stop the vehicle in which he left the transaction site.

Once the vehicle was stopped, the scope of the subsequent intrusion was minimal. See Terry, 392 U.S at 20 (pointing out that reasonableness inquiry includes examining both the justification for the stop and the scope of the subsequent intrusion). The police simply asked the car's occupants for identification. See United States v. Quarles, 955 F.2d 498, 501 (8th Cir. 1992) (treating identification of driver as part of justified vehicle stop); cf. United States v. Abokhai, 829 F.2d 666, 670 (8th Cir. 1987) (concluding that investigative stop of pedestrian was minimally intrusive where "the detention and inquiry were brief and did not involve questions beyond a request for identification and an explanation of their presence"). The district court did not err in denying Botello's motion to suppress.

II.

Botello argues that there was insufficient evidence to convict him. Our standard of review is familiar:

> We review the sufficiency of the evidence to sustain a conviction de novo. We must view the evidence in the light most favorable to the government, resolve conflicts in the government's favor, and accept all reasonable inferences that support the verdict. We uphold a conviction if substantial evidence supports it. Substantial evidence is that which suffices to convince a reasonable jury of a defendant's guilt beyond a reasonable doubt, not that which rules out all reasonable hypotheses of innocence.

United States v. Grimaldo, 214 F.3d 967, 975 (8th Cir. 2000) (citations omitted), cert. denied, 121 S. Ct. 330 (2000); 121 S. Ct. 784 (2001); see Glasser v. United States, 315 U.S. 60, 80 (1942).

"To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." United States v. Ivey, 915 F.2d 380, 383-84 (8th Cir. 1990). "A conspiracy may be inferred from circumstantial evidence," Grimaldo, 214 F.3d at 975, and "[o]nce a conspiracy has been established, only slight evidence is needed to link a defendant to the conspiracy," United States v. Pena, 67 F.3d 153, 155 (8th Cir. 1995).

Botello argues that there was insufficient evidence to conclude beyond a reasonable doubt that he knowingly participated in any conspiracy to distribute methamphetamine. We conclude that the evidence was more than sufficient. First, Botello drove Mora-Higuera to and from the drug buy of December 20th and was present at the second controlled buy on December 28th. Second, two of his alleged co-conspirators testified that he was a knowing participant in the drug ring, allowing his house to be used as part of the conspiracy and transporting money into Mexico. Third, drug buy money was found in Botello's residence, the majority in the soles of shoes that belonged to him. Cf. United States v. Barrett, 74 F.3d 167, 168 (8th Cir. 1996) (holding that testimony of three alleged co-conspirators was enough to convict defendant of conspiracy even where there was contradictory testimony and no physical evidence).

III.

Botello argues that the issue of drug quantity should have been submitted to the jury rather than decided by the district court. Botello did not raise this issue below, and thus we review only for plain errror. United States v. Butler, 238 F.3d 1001, 1005 (8th Cir. 2001).

The Supreme Court has recently held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). Because Botello's sentence did not exceed the statutory maximum for conspiracy to distribute methamphetamine independent of drug quantity, see 21 U.S.C. § 841(b)(1)(C) (1994 & Supp. V 1999), there is no error. United States v. Ortiz, 236 F.3d 420, 422 (8th Cir. 2001). As long as the final sentence is less than the maximum allowed by the jury verdict, neither the impact of the district court's drug quantity determination on application of the Sentencing Guidelines to defendant nor its impact on mandatory minimums under the statute implicates Apprendi. United States v. Lewis, 236 F.3d 948, 950 (8th Cir. 2001) (sentencing guidelines); United States v. Aguayo-Delgado, 220 F.3d 926, 933-34 (8th Cir. 2000), cert. denied, 121 S. Ct. 600 (2000) (mandatory minimums).

The fact that drug quantity was specifically set out in the indictment, and that the section of the statute referred to in the indictment, 21 U.S.C. § 841(b)(1)(A) (1994 & Supp. V 1999), specifically mentions drug quantity does not change the result.

> In order to prevail in a claim of fatal variance between the proof offered at trial and the wording of the indictment, [Botello] must establish not only variance, but also that the variance affected his substantial rights. The variance must go to the heart of the indictment with the proof offered at trial failing to establish one of the crucial elements necessary

for prosecution under sections of the United States Code charged in the indictment.

United States v. Anderson, 618 F.2d 487, 490 (8th Cir. 1980) (citations omitted). Since the sentence imposed here is less than the statutory maximum allowed by the jury's verdict, drug quantity under § 841(b)(1)(A) remains a sentencing factor that may be determined by the district court, not an element that must be proved to the jury. Aguayo-Delgado, 220 F.3d at 933. Thus, there is no fatal variance.

IV.

Botello challenges the prosecution's conduct at trial. In his closing argument the prosecutor stated that "when Mr. Botello is driving drug dealers around on December 20th and again on December 28th, there is nothing to prevent him from knowing what's going on. He speaks English." Botello argues these remarks about his ability to speak English violated his due process and equal protection rights by effectively penalizing him for using an interpreter at trial. Since Botello did not object at trial, we review for plain error. "Under plain error, the question for determination is whether the argument was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice." United States v. Segal, 649 F.2d 599, 604 n.10 (8th Cir. 1981) (internal quotation marks omitted).

Botello used an interpreter at trial and was entitled to do so. See United States v. Gallegos-Torres, 841 F.2d 240, 242 (8th Cir. 1988) ("A defendant who has difficulty with the language has a right to an interpreter."). However, one of the issues before the jury was whether Botello knowingly participated in the conspiracy. It was therefore proper for the prosecution to argue that Botello understood the drug-related conversations he may have been privy to between Mora-Higuera and the informant while he was driving Mora-Higuera around. Cf. Portillo v. United States, 609 A.2d 687, 691 (D.C. 1992) ("Given appellant's denial that he understood

English, the question whether he in fact understood and spoke enough English to carry on the conversation which the government asserted he had had with Officer Thomas was an issue in the case.").

V.

At trial the district court granted the government's request for permission to cross-examine one of its own witnesses, Alejandro Mora. Botello argues this was error. Since Botello did not object at trial, we review only for plain error. United States v. Campa-Fabela, 210 F.3d 837, 840 (8th Cir. 2000).

While leading questions are generally not permitted during direct examination, they "may be used where 'necessary to develop the witness' testimony.'" United States v. Stelivan, 125 F.3d 603, 608 (8th Cir. 1997) (quoting Fed. R. Evid. 611(c)). "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Fed. R. Evid. 611(c). "The trial court is in the best position to evaluate the necessity of leading questions during direct examination." Stelivan, 125 F.3d at 608.

Here, the prosecution requested permission to use leading questions after its witness, Alejandro Mora, became evasive and unclear about the types of drugs involved in the conspiracy. An examination of the transcript reveals that after the government received permission to cross, it asked at most eleven leading questions, most of them foundational. Alejandro Mora was a relative of Botello, testifying as part of a plea agreement. The district court judge had heard Alejandro Mora's guilty plea testimony just three days earlier. Cf. Stelivan, 125 F.3d at 608 ("The district court judge had presided over Stelivan's guilty plea proceeding and was therefore familiar with his manner of testifying."). We conclude there was no plain error in the district court's decision to permit leading questions for a brief period.

-9-

## VI.

Jose Mora-Higuera raises one argument on appeal. Mora-Higuera testified during his guilty plea hearing that he and his co-conspirators distributed approximately twenty pounds of methamphetamine and cocaine during the life of the conspiracy. The pre-sentencing report incorporated this amount, triggering a base offense level of thirty-six. Mora-Higuera then filed a position pleading requesting a downward departure, in part because his estimate of twenty pounds had been "little more than a rough estimate." At the sentencing hearing he specifically stated he had no objections to the pre-sentence report, instead repeating his request for a downward departure. The district court acknowledged its authority to depart downwardly, but declined to do so. Mora-Higuera now challenges the inclusion of the twenty pounds as relevant conduct under U.S. Sentencing Guidelines Manual § 1B1.3.

Because the district court was aware of its authority to depart downwardly, its decision not to depart is unappealable. United States v. Hawkins, 102 F.3d 973, 976 (8th Cir. 1996). Furthermore, because Mora-Higuera did not object to the inclusion of the twenty pounds in the pre-sentencing report, and in fact affirmatively declined to do so, he waived the issue. United States v. Elliott, 89 F.3d 1360, 1367 (8th Cir. 1996). Were we to reach the issue, we would not conclude that the inclusion of the twenty pounds was clearly erroneous. The twenty pound amount was based on the testimony of Mora-Higuera himself. Cf. United States v. Shonubi, 103 F.3d 1085, 1089 (2d Cir. 1997) (pointing out that even under the Second Circuit's more rigorous "specific evidence" standard, a defendant's own admission is sufficient proof of drug quantity for the purposes of sentencing). This admission is sufficient, particularly in light of the fact that the government produced evidence in the trial of Mora-Higuera's co-conspirator, presided over by the same judge, that the conspiracy actually involved over 100 pounds.

VII.

For the foregoing reasons, we affirm Botello's conviction and Mora-Higuera's sentence.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.